# N.

## Case No. 10,002.

### The NABOB.

[Brown, Adm. 115.] [1]

District Court, E. D. Michigan.    April, 1864.[2]

COLLISION—RIGHT OF ALIEN OWNER TO SUE—
WHEN FORFEITURE BECOMES OPERATIVE—
TUG AND SAILING VESSEL—LOOKOUT.

1. The fact that prior to the collision, an interest in the injured vessel had been transferred to an alien, and a forfeiture thereby incurred, does not prevent such alien owner from joining in the libel, the forfeiture never having been judicially declared by a condemnation.

2. A tug having vessels in tow, when meeting a sailing vessel, is subject to the rules applicable to ordinary steamers.

[Cited in The Excelsior, 12 Fed. 205.]

3. A tug having only a mate and wheelsman on deck is insufficiently manned. A lookout is absolutely necessary.

[Cited in The Excelsior, 12 Fed. 200, 201.]

Libel and cross libel for collision. The libel was filed to recover damages from the owners of the Nabob, for colliding with and sinking the steamtug John Martin, the alleged property of the libellants. The schooner Nabob was on her voyage from Buffalo to Milwaukee. Having been towed out of the St. Clair river into Lake Huron, on the evening of May 16th, 1863, she anchored in the lake for want of wind to continue her voyage. She remained at anchor until midnight, when she again started on her voyage up the lake, her course being north by west, for Pointe aux Barques. The tug John Martin, engaged in the business of towage, and in search of vessels in Lake Huron, took in tow the bark British Lion, a short distance above the village of Lexington, and about thirty miles from the river St. Clair, and headed for the river, designing to procure other vessels, which she expected on her way down, her course being south or about south half east, and four miles from shore. Just about daybreak she was run into by the Nabob, which struck her amidships, and so forcibly that she immediately went to the bottom. It was further alleged and proved, that the tug John Martin having been duly enrolled and licensed, was in January, 1863, transferred in part by John Pridgeon, her owner, to William K. Muir, one of the libellants, who was at the time a subject of her Britannic majesty; that subsequent to her enrolment and license as the sole property of Pridgeon, libellants knowingly and unlawfully used such enrolment and license, together with the custom house certificate thereof. It was also admitted upon the trial, that Pridgeon made oath at the custom house, in Detroit, that he

1 [Reported by Hon. Henry B. Brown. District Judge, and here reprinted by permission.]
2 [Affirmed by the circuit court; case unreported.]

and Muir were both citizens of the United States, and not subjects of any foreign power. This oath was not true, as Muir had never been naturalized, but had simply declared his intention to become a citizen, though Pridgeon had taken the oath under the erroneous impression that his declaration of intention had actually made him a citizen.

W. A. Moore, Wm. Gray, H. H. Emmons, Geo. Jerome, and Geo. V. N. Lothrop, for libellants.

J. S. Newberry and Alfred Russell, for respondents and cross libellants.

Pridgeon and Muir, at the time of the collision, and at the time of bringing suit had no title to the tug John Martin. The title was in the United States.

(1) The evidence shows that John Pridgeon sold one-third of the tug (being then an enrolled and licensed vessel) to Muir, who was then a British subject. This forfeited the vessel. Act 1793, § 32 [1 Stat. 316], Brightly, Dig. p. 149, § 46; Act 1792, § 16 [1 Stat. 295], Brightly, Dig. p. 829, § 16.

(2) On April 28th, 1863, Pridgeon took and subscribed an oath at the custom house, stating Muir to be a citizen, which was not true, and obtained a new enrolment and license upon the oath. This forfeited the vessel. Act 1792, § 4 [1 Stat. 289]; Brightly, Dig. p. 824, § 4.

(3) No title passed to Muir by the sale; he was a foreigner—incapacitated to receive a title to an American built vessel—consequently, as one of the joint libellants never had any title to the tug, the suit must fail.

(4) Pridgeon's title was divested from him and vested in the United States at the moment of sale to Muir, so that neither libellant had title to their interest.

In U. S. v. 1960 Bags of Coffee, 8 Cranch [12 U. S.] 405, it was held that a sale to a bona fide purchaser for value without notice did not prevent condemnation. See also Conk. Treat. (3d Ed.) 526, and cases cited; Gelston v. Hoyt, 3 Wheat. [16 U. S.] 311; Caldwell v. U. S., 8 How. [49 U. S.] 366, 381; McLane v. U. S., 6 Pet. [31 U. S.] 427.

No proceedings to condemnation are necessary to effect a change of title—in fact the United States never get any record or paper title. The Florenzo [Case No. 4,886].

WILKINS, District Judge. The severe penalty prescribed by the statute was undoubtedly intended to prevent false swearing in taking the oath necessary to obtain enrolment. and the fact that the oath was taken in haste and in ignorance that Muir had only declared his intention of becoming a citizen, would be no excuse in a prosecution for a forfeiture. By the 7th section of the act of

1792, in regulation of the coasting trade, the certificate of enrolment is to be solely used for the vessel for which it is granted, nor can it be sold or disposed of to any person whatsoever, but shall be delivered up under the circumstances described, to the collector of the district; and if any foreigner shall purchase the whole, or any part of the ship, the delivery of the certificate shall be made within seven days. By the 16th section, if such sale be made to a foreigner, and be not reported and made known, such ship, her tackle, apparel and furniture shall be forfeited. This section clearly contemplates a trial before the forfeiture is incurred.

The proofs establish the fact that, previous to the collision, one-third of the John Martin was conveyed by Pridgeon, one of the libellants, to the other libellant Muir, and that Muir was not then, and is not now a citizen of the United States. It is contended by the claimants that, by this alien ownership, the tug was eo instanti forfeited to the United States, and that one of the libellants having no title, this action cannot be maintained. The case of The Mohawk [3 Wall. (70 U. S.) 566], though not exactly this case, was a proceeding for a forfeiture under the act of 1792. There was, however, a subsequent purchaser, without notice and before condemnation, whose interest was involved in the controversy. This, however, is a case of collision, by which a trespass was committed by the claimants, and for which damages are sought to be recovered. The res, though forfeited under the act of congress, yet that forfeiture never having been enforced by the government, nor the vessel seized, it has remained in the possession of its alien owner. No information was made until the close of this trial, and the government has since remitted the penalties. It is true the.language, "shall be forfeited," is positive; but the forfeiture was never judicially consummated, nor the vessel condemned. It is true the libellants, being the transgressors, cannot plead want of notice or ignorance of the act whereby the forfeiture was incurred, but they were still in possession at the time of the trespass; no right or title had been asserted by the United States, which might never see fit to enforce the forfeiture; and, until the assertion of a claim, the res remains under the protection of those in possession, who, at least, have a quasi title that would sustain an action of trespass against a wrongdoer. Whether there was a forfeiture or not is an issue not to be tried in this case.

Under the act of 1792, I am satisfied that no forfeiture is consummated until decree of condemnation. Where such decree is pronounced, it will, according to circumstances, modify or control subsequent transfers. The Bags of Coffee Case, 8 Cranch [12 U. S.] 398, involved the validity of a sale after forfeiture, though the purchase was made in good faith before condemnation. The question arose as to the title of the purchaser as

against the United States, and it was held the condemnation consummated the forfeiture. This case certainly does not apply to the facts now before the court, as there has been no decree, and by the act of the government in omitting to prosecute, the owners implicated in the offence remained in possession until the collision. The case of Gelston v. Hoyt, 3 Wheat. [16 U. S.] 311, simply exonerated the officer from trespass in making the seizure, but held him to respond in damages where no forfeiture was proved at the trial, and no certificate of probable cause given. In Caldwell v. U. S., 8 How. [49 U. S.] 366, the rule is clearly stated, that the United States acquires no title by the mere forfeiture, but, in order to avoid sales between forfeiture and decree, the latter has relation back to the offence. There must be a consummation by judicial decree to vest title in any one as against the owners. If otherwise, how can the ship be protected? Is she to rot at the wharf until prosecution is commenced? Is she to be abandoned when no one claims her possession? When negligently damaged by others, who is to sue for recovery? What provision thus makes the vessel an outlaw? I do not think the act, in directing a prosecution and trial, contemplates an instantaneous forfeiture upon the commission of the offence, and therefore hold that the libellants are rightfully in court.

This collision occurred in Lake Huron, the Nabob being on a northerly course up the lake, and the Martin with her tow steering south by east, and bound for the river St. Clair. It is conceded that if the Nabob, being a sailing vessel, kept her course, she was not in fault, and the Martin is responsible. This is a simple question of fact. Much time was consumed in the examination of the proofs, as to the direction of the wind, though not with a view to an argument that if the wind was not free to the Martin, she is measurably exculpated. To such a proposition I could not assent for one moment. The Martin was propelled by steam power, and, whether the wind was free or not, she must avoid a sailing vessel, the law considering the propulsive power of a steamer as tantamount to a free wind. But the direction of the wind becomes important simply in regard to the course of the Nabob at the time of collision; for if the Nabob, after weighing anchor, took her course after midnight north by west, with the wind west southwest, she had a free wind, and could easily keep her course; but otherwise, if the wind was north of west. Upon this point the proofs were conflicting, and to so great and so painful an extent that the court is compelled to believe that there is either willful perjury on one side or the other, or that the wind, within the period of half an hour, was most wonderfully capricious. There is great difficulty in the settlement of facts where the crews of antagonistic vessels come in conflict in court. Abeel, the second

mate of the Nabob, swears that the wind was W. N. W. when he made the light of the tug, and he is followed by Byron, Clancey, Willes, and Bensly, of the crew of the Nabob; while Barret, Allen, Dumass, and others, of the Martin and Lion, swear as positively to the wind being W. S. W. But it has been settled, in the case of The Genesee Chief [12 How. (53 U. S.) 463], that the crew of the sailing vessel, as to the direction of the wind, is most entitled to credit. Hilson, the captain of the Nabob, whose calm and deliberate manner, as a witness, most favorably impressed the court as to his truthfulness, says: "The wind varied in the space of one hour in four different directions, but that, near the time of the collision, it was W. N. W., free and steady, the Nabob keeping her course." This is a positive and credible declaration. The testimony of this witness is so conclusive on the main point in controversy, that the court has no hesitation in declaring, that, giving him credence, the libel must be dismissed. He says that "he was towed out of the river a little after 8 o'clock in the evening, and was left by the tug Eagle a mile out in the lake, and the wind being light, he came to anchor. That he got under weigh again shortly after midnight. The wind was then light, from the southwest; that he steered north by west. In a few minutes the wind hauled about to the northwest, and we headed then north by east. In a few minutes she came up north by west half west, and the wind was variable from that time until about two o'clock. It then settled into west northwest. I told the wheelsman if she would go as far as north by west half west, to let her go; if not, to keep her full and by. I was close by the compass, and noticed how she was heading at that time, about two o'clock. My watch commenced at midnight, with Abeel, Byron, and Clancey. Shortly after two o'clock I turned in, after giving the wheelsman directions to keep her on that course, which I also communicated to the second mate. I directed him to call me if he saw anything he did not understand. The wind was then west northwest, and my vessel was on her course at that time, and carrying a green light, all sails set except the square sail. We were on the port tack." This was when he left the deck. Further, he says: "On turning in, I only took off my boots, coat, and hat. Afterwards the mate called me, and I came on deck with what clothing I had on. Heard the tug's whistle; saw her on my lee bow, about two points, and heading across my bow, going pretty fast, and about five hundred feet off, and I immediately ordered my helm hard up." In response to a question propounded by the court, this witness said: "When I came back on deck, the Nabob was on the same course as when I turned in, and did not swing, or, if she did, she swung to the eastward." This is to the point. I repeat, then, if this witness is to be credited, the tug was in fault, and not the Nabob, be-

cause, 1st, the latter kept her course till the moment of collision; 2d, the Martin was heading across her bows; and 3d, his retiring from the deck, to obtain rest, and leaving the vessel in charge of the second mate, was not a fault contributing to the collision. If such neglect of duty caused the collision, or might have led to it, then it was such a fault as would have condemned his vessel. But he swears positively the Nabob was on the same course as when he left the deck, and, as positively, that the Martin was crossing his bows.

Aware of the importance of Captain Hilson's testimony, the libellants have undertaken to impeach his credibility; not on the ground of mistake or failure of memory, but for absolute corruption. Mistake in incidental particulars, or a failure of recollection as to collateral facts, or a disagreement between the witness and others as to material facts, will not impeach his credibility; but knowingly swearing falsely, or giving two different versions of the same transaction, must exclude the whole testimony from consideration. Now, Captain Barret, the master of the Martin, does not, in my estimation, so impeach the credibility of Hilson. Hilson swears he was on deck. This fact is not disproved by Barret's simply stating that he told him he was in bed. And, as to the conversation of which Barret testifies, it is but the adverse statements of the two masters, after the collision, when both were striving to exculpate their respective vessels, and under the excitement of the moment, when Barret's crew had been just rescued from drowning. He may or may not have made the statement; or, if made, and days after he denied it, his cool and firm denial of it in court frees him from the taint of willful perjury. It is but witness against witness. And, as to the alleged contradiction by Abeel calling him after the tug's whistle, it is not so conclusive or satisfactory as to warrant the entire rejection of Hilson's testimony, for the tug may have whistled both before and after the captain was called. I pass by Swartwourt, as to the tow bill, and Enwright, as to the steeve of the bowsprit, as unworthy of serious attention, in this connection. The rule of impeachment is not of such an iron character as to condemn a material fact as false which corresponds with other proof, because other statements made by the witness have been, by the preponderance of number, successfully contradicted. Money has purchased—power sometimes overawes—and it will not do to weigh testimony by the multiplicity of the witnesses, especially in hotly contested admiralty cases. Difficult as it sometimes is, I have always endeavored to get at the facts, through the manner and matter of the witness. If he carries the appearance of integrity and candor, and his testimony is consistent with itself and all the surrounding circumstances, I cannot but yield my confidence, despite trifling discrepancies. The rejection of Captain Hilson's testimony, however, could not change the determination

of the case. The law casts the burden of proof upon the master of the steamer who sues, to prove that his vessel exercised all proper care and diligence and prudence to avoid the collision. It will not do for the steamer to say that the sailing vessel was first in fault.

If the tug has violated the law and the rules of navigation, especially if such infraction be a primary omission or fault, she cannot recover, if the same has led to the casualty. Steamtugs are vessels propelled by steam. As such they are governed by the rules applicable to steamers; and as to precautionary regulations, having other vessels in tow and in peril, there is more reason for their strict observance by steamtugs than by steamers. The law in admiralty in regard to this is well settled. As early as The Genesee Chief, 12 How. [53 U. S.] 463, it was declared by Chief Justice Taney, that "it is the duty of every steamboat traversing waters where sailing vessels are often met with, to have a trustworthy and constant lookout besides the helmsman." "And whenever a collision occurs with a sailing vessel, and no other lookout is on board but the helmsman, such omission is prima facie evidence that the collision was occasioned by her fault."

From this decision, in 12 How., down to The Louisiana v. Fisher, in 21 How. [62 U. S. 29], there is one unvarying strong current of authority in the same direction; the last case making the rule more stringent in requiring proof of the competency of such lookout, and prescribing, as his station, the most suitable place for his observation. In the intervening case, in 18 How., the steamer was a tug, and the rule by Chief Justice Taney, in the 12th, applied by Mr. Justice Nelson, drawing no distinction between steamboats and steamtugs. Without referring to the other cases since The Genesee Chief [supra]—and they are numerous—the correct doctrine as to lookouts, thus collated and embodied is this: All vessels propelled by steam, navigating the highways of commerce, must have constant and vigilant lookouts, employed as such, and so stationed on deck as to possess timely and perfect observation of all approaching or passing vessels, so as readily to ascertain their courses and movements, so far as practicable under all the surrounding circumstances. By the proofs in this case, the mate, Allen, was the only lookout. He and the wheelsman were in charge of the tug at the time. Without reference to his competency, which has been assailed, I entertain no doubt that his gross neglect misled the tug across the bows of the Nabob, and caused the collision. A wheelsman is not a lookout. He cannot discharge that duty when steering by the compass. His attention is to his wheel and the compass—not over or beyond them. The mate, having the general command of the vessel, cannot perform lookout duty. He has the general supervision of the ship, and directs both the wheelsman and engineer.

While so engaged searching for vessels, he cannot discharge the duty of lookout, as required by the law. This neglect, then, as to a lookout, was a fault, and, as such, if there was no other, must prevent a recovery by the libellants.

Libel dismissed and decree for cross libellants.

This case was affirmed on appeal to the circuit court. [Case unreported.]